# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3090-18T3

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

v.

R.G.,

      Defendant-Respondent.

_____

**APPROVED FOR PUBLICATION**

**July 31, 2019**

**APPELLATE DIVISION**

Argued June 4, 2019 – Decided July 31, 2019

Before Judges Fisher, Suter and Enright.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 17-04-0189.

Paul Henry Heinzel, Assistant Prosecutor, argued the cause for appellant (Michael H. Robertson, Somerset County Prosecutor, attorney; Paul Henry Heinzel, of counsel and on the briefs).

Joseph J. Russo, Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Joseph J. Russo, on the brief).

Alexander R. Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander R. Shalom and Jeanne M. Locicero, on the brief).

The opinion of the court was delivered by

SUTER, J.A.D.

The State appeals the January 7, 2019 order of the trial court that denied its request for an order to involuntarily medicate defendant R.G. to restore him to competency to stand trial. We affirm the trial court's order. We agree with the trial court that the State did not satisfy the test under Sell v. United States, 539 U.S. 166 (2003), because the first factor is determined by consideration of defendant's probable sentence not simply the maximum sentence exposure for the offense charged. The trial court also must consider the potential effect of the medication on defendant's right to a fair trial when applying Sell. Because the Sell test was not satisfied, we have no occasion to determine whether our State Constitution would afford a defendant greater protection of individual liberty or privacy rights.

I

Defendant's mother was attending a wedding in California when she asked the police to check on her husband's welfare because she had not heard from him. Defendant answered the door when the police arrived dressed only in a blanket. The police inquired about his father. Defendant pointed to the floor where his father was lying. A pool of blood was near his father's mouth. He

had vomit on his face, was breathing but with difficulty, and had a mild pulse. There were no visible signs of trauma. Defendant told the police his father had been laying there for about twelve to twenty-four hours. Defendant was waiting to summon help because his father had a similar gastrointestinal bleed in the past and recovered. Defendant also told the police illogical things about developing weapons for the government. Defendant's father died at the hospital the next day of natural causes.

Defendant was charged with third-degree neglect of an elderly or disabled person, N.J.S.A. 2C:24-8(a). He remained in jail from mid-December 2016 until the end of May 2017, when his bail was reduced and he was released. More than eight months later, and following a request by his attorney, the trial judge entered an order under N.J.S.A. 2C:4-5(a)(2) that required defendant to take a fitness to proceed (competency) examination. The examining psychologist recommended conducting the examination in a hospital.

On June 1, 2018, defendant was remanded to the Somerset County Jail without bail and later admitted to Trenton Psychiatric Hospital (TPH) for the competency evaluation that was conducted in October 2018. He was found not competent to stand trial. To our knowledge, he remains a patient at TPH.

In October 2018, the State filed a motion for an order to require defendant to be involuntarily medicated because defendant refused to take antipsychotic medication voluntarily. The State claimed it had an important interest in restoring defendant to competence, that he would likely become competent with medication and that medication was in his best interest.

At the competency hearing in December 2018, Dr. Jonathan L. Rapaport, a forensic psychologist, testified, based on his examination, that defendant had a delusional disorder and psychosis because he believed his father was still alive even though he had been shown the autopsy photographs. Defendant's mental illness was impairing his ability to assist his attorney with a defense. Dr. Rapaport testified defendant was not competent to stand trial.

He recommended steps to restore defendant to competency: defendant should attend a competency restoration group at TPH to assist in understanding the legal process and take antipsychotic medication. Dr. Rapaport opined that medication would "help greatly" to alleviate defendant's psychosis and "very likely" improve defendant's mental state. Defendant was not participating in any groups at TPH. Although defendant remained competent to decide his own medical issues, he was refusing to take any antipsychotic medication.

A-3090-18T3

Dr. Rapaport testified the medication was a necessary treatment for defendant and the lack of medication was preventing him from becoming competent to stand trial. He claimed that defendant "possibly" was a danger to himself or others because he had become physically agitated when they were discussing the medication issue, and because he allegedly had a history of assault and domestic violence. Dr. Rapaport testified that medication would help defendant's delusions "to gradually dissipate" although there was "no guarantee." Defendant's psychosis was severe. Dr. Rapaport was of the view that although defendant's participation in group therapy would be helpful, antipsychotic medication was "necessary."

Dr. Yves George Dubois, an attending psychiatrist at TPH, also examined defendant. He testified that defendant did not have the mental capacity to stand trial. Defendant had a delusional disorder with a "disorganized" thought process and "bizarre" thinking. With this "chronic psychosis," defendant was "losing brain cells" that eventually could impair his memory and affect his activities of daily living. Defendant could become dangerous. Dr. DuBois recommended that defendant take medications such as Haldol or Prolixin to gain competence to proceed to trial and for his mental health. Either medication was medically appropriate for his condition. Because Prolixin could cause a rise in "blood

A-3090-18T3

pressure, weight gain [and] diabetes," Dr. Dubois recommended prescribing Haldol.

He testified that both antipsychotic medications could cause "abnormal movement, like shaking, tremors" and "rigidity," but there were other medications to control that. In his opinion, the side effects from the medication would not undermine the fairness of a trial. For drowsiness, he suggested decreasing the dosage. He testified the medication would not prevent defendant's rapid reaction to events that happened on the stand. Dr. Dubois acknowledged that Haldol could decrease defendant's ability to express emotions, but he testified, "we have other medication to counteract that and we can also decrease the dosage."

Dr. Dubois testified that defendant was becoming more delusional although he was not declining cognitively, meaning that defendant could appreciate the necessity to take medication to improve his life. He was not violent. He did not pose an imminent danger at TPH. Because of this, Dr. Dubois could not administer the antipsychotic medication without defendant's consent or a court order.

Dr. Dubois testified it was in defendant's best medical interest to take the medication. He thought there was a reasonable probability the medication

A-3090-18T3

would enable defendant to participate in a trial. In his view, therapy alone would not be enough.

The trial court continued defendant's commitment at TPH for another ninety days.[1] With respect to the State's pending motion to involuntarily medicate defendant, the parties were ordered to submit additional briefing on whether there was an important government interest at stake that would require defendant's involuntary medication. The court noted the doctors both testified that medication would likely restore defendant to competency, and that medication was necessary and was medically appropriate.

On January 7, 2019, the trial court denied the State's motion to medicate defendant involuntarily. In its written opinion, the trial court applied the four factors outlined by the Supreme Court in Sell, even though it was "hesitan[t] to allow for the practice of involuntary medication of defendants for restoration in the absence of any clear authority in New Jersey," and because it questioned the constitutionality of the practice under our State's Constitution. Nonetheless, the trial court found the State had not proven it had an important governmental

---

[1] A subsequent competency review hearing was held on March 28, 2019, where the court declined to dismiss the charges at that time. See N.J.S.A. 2C:4-6(c) (providing that where a defendant "has not regained his fitness to proceed within three months, the court shall hold a hearing on the issue of whether the charges against him shall be dismissed with prejudice or held in abeyance").

interest at stake as required by the first factor under Sell, 539 U.S. at 180.  The trial court reasoned that defendant had a presumption of non-incarceration, having been charged with a third-degree offense and having no prior convictions,[2] and "would likely receive a probationary sentence if convicted." Moreover, the court noted that defendant had been at TPH longer than his likely sentence if convicted.  His "charges appear[ed] to have stemmed from the nature of his delusions" and he may have been "suffering from a psychotic episode at the time."  Defendant also remained subject to confinement at TPH.  All of these factors lessened the governmental interest to the point that the court would not order involuntary medication.  The court found that the other factors under Sell had been established.

The State filed a motion for leave to appeal.  While that was pending, the trial court supplemented its written decision to address issues and cases the State presented in its motion for leave to appeal, which it had not raised earlier.  The court did not agree with the State's argument that the first factor under Sell—the importance of the State's interest—should be determined based solely on the maximum sentence authorized for the offense charged.  The court rejected this in favor of a probable sentence approach because New Jersey's Constitution

---

[2]  See N.J.S.A. 2C:44-1(e).

"generally affords greater protections of an individual's liberty than provided for in the Federal Constitution." The State newly argued that defendant's crime constituted an act of domestic violence and that a presumption of incarceration applied. The court rejected the argument that all crimes of domestic violence would satisfy the seriousness factor under Sell, opting instead for a case-by-case approach. The State did not present evidence that defendant was convicted of domestic violence in the past, which rendered aggravating factor fifteen[3] inapplicable to this case. The trial court concluded that even if the new arguments by the State had been made previously, "they would not have been determinative of the outcome of the State's motion."

In March 2019, we granted the State leave to appeal the trial court's January 7, 2019 order, and allowed supplemental briefing. We subsequently granted the American Civil Liberties Union of New Jersey's request to participate as amicus curiae.

On appeal, the State argues that it has a great interest in prosecuting this case. It contends it has satisfied all the required factors under Sell for an order

---

[3] Reference is to N.J.S.A. 2C:44-1(a)(15) (providing that an aggravating circumstance for sentencing is an offense constituting an act of domestic violence and "the defendant committed at least one act of domestic violence on more than one occasion").

to medicate defendant involuntarily to restore him to competence to stand trial. Amicus curiae argues that defendant has a significant liberty interest in bodily integrity protected by both the Federal and State Constitutions; that the State Constitution prohibits any forced medication of a non-dangerous defendant just to restore him to competency to stand trial; and that in determining whether to involuntarily medicate defendant, the trial court must take into consideration the impact that medication will have on defendant's right to a fair trial.

II

A

We consider this issue in the context of decisions by the United States Supreme Court that have addressed the issue of involuntary medication of prisoners with mental illness. In Washington v. Harper, 494 U.S. 210 (1990), a Washington State regulation allowed for the involuntary medication of a convicted offender when "the mentally ill inmate [was] 'gravely disabled' or . . . present[ed] a 'serious likelihood of harm' to himself or others . . . ." Id. at 220. In affirming the regulation against a due process challenge, the Court recognized that Harper had a "significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Id. at 221-22 (citing Vitek v. Jones, 445 U.S.

480, 491-94 (1980); <u>Youngberg v. Romeo</u>, 457 U.S. 307, 316 (1982); <u>Parham v. J.R.</u>, 442 U.S. 584, 600-01 (1979)).  The Court observed that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." <u>Id.</u> at 229 (citing <u>Winston v. Lee</u>, 470 U.S. 753 (1985); <u>Schmerber v. California</u>, 384 U.S. 757, 772 (1966)). It also took note of the possible side effects of the medications.[4]  After considering the competing individual and State interests, the Court held that "given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." <u>Id.</u> at 227.  The Court found that the procedures under the regulation afforded the inmate adequate procedural due process. <u>Id.</u> at 228.

In <u>Riggins v. Nevada</u>, 504 U.S. 127 (1992), a defendant appealed his conviction for murder and robbery, claiming a due process violation because he

---

[4]  These can include "acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes"; "akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction)"; and "[t]ardive dyskinesia . . . a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face." <u>Id.</u> at 229-30.

A-3090-18T3

was required to take certain psychotropic medications during his trial although he had requested to terminate their administration. Riggins claimed he was denied due process because of the effect of the drugs on his demeanor and mental state during trial, while the State contended the drugs were needed to maintain his competence to stand trial. Id. at 133.

The Court considered its decision in Harper that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness," and concluded that the "Fourteenth Amendment affords at least as much protection to persons the State detains for trial." Id. at 135 (citing Bell v. Wolfish, 441 U.S. 520, 545 (1979); O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987)). Had the State proven "that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others," it would have satisfied due process. Ibid. (citing Harper, 494 U.S. at 225-26; Addington v. Texas, 441 U.S. 418 (1979)).

The Court reversed the convictions because the trial court failed to make adequate findings to support "the need for this [medication and did not make] any findings about reasonable alternatives." Id. at 136. It also did not make findings that "safety considerations or other compelling concerns outweighed

12

Riggins' interest in freedom from unwanted antipsychotic drugs." Ibid. This may have infringed upon his right to a fair trial, noting that the side effects from the drugs may have "had an impact upon not just Riggins' outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." Id. at 137. The Court held that "[b]ecause the record contain[ed] no finding that might support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy," the Court had "no basis . . . for saying that the substantial probability of trial prejudice in this case was justified." Id. at 138.

In a concurring opinion, Justice Kennedy voiced concerns about the effects of the drugs on a defendant's right to a fair trial, expressing that the "side effects seems to me to render involuntary administration of the drugs by prosecuting officials unacceptable absent a showing by the State that the side effects will not alter the defendant's reactions or diminish his capacity to assist counsel." Id. at 143 (Kennedy, J., concurring).

B

The Court addressed the issue of involuntary medication—this time for a defendant who was not convicted—in the Sell case. 539 U.S. at 166. Sell was

A-3090-18T3

charged with mail fraud, Medicaid fraud, money laundering and attempted murder. Id. at 170. He was found not competent to stand trial. Id. at 171. The State recommended that he take antipsychotic medication to restore him to competency to proceed. Ibid. When he refused, the State sought permission from the court to require Sell to be involuntarily medicated. Ibid.

In Harper and Riggins, the Supreme Court noted that:

> the Constitution permits the [g]overnment involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests.

[Id. at 179.]

The Court identified four factors that had to be satisfied before a court could order involuntary medication to restore a defendant to competency to stand trial for serious, but nonviolent crimes. Id. at 180-81.

"First, a court must find that important governmental interests are at stake. The [g]overnment's interest in bringing to trial an individual accused of a serious crime is important." Id. at 180. The Court said, however, that "special circumstances" might lessen the importance of the State's interest. Ibid. These

14

could include the length a defendant has been confined because that "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." Ibid. A lengthy confinement may also make it difficult to prosecute a defendant. Ibid. The "potential for future confinement" and the length of time a defendant had been confined, "for which he would receive credit toward any sentence ultimately imposed . . . ." all affected the State's interests. Ibid. The Court recognized the State "has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." Ibid.

The second Sell factor requires a trial court to conclude that involuntary medication "is substantially likely to render the defendant competent to stand trial" and that it "is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." Id. at 181 (citing Riggins, 504 U.S. at 142-45 (Kennedy, J., concurring)).

The third factor requires the State to show that medication is "necessary to further those interests" and that "less intrusive treatments are unlikely to achieve substantially the same results." Ibid.

A-3090-18T3

The fourth factor requires the trial court to "conclude that administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." Ibid.

The Court made clear that the instances where these factors would be met "may be rare."[5] Id. at 180. Because they were not satisfied in Sell, the Court reversed the order that required involuntary medication and remanded the case. Id. at 186.

The Court emphasized the concerns it had raised in Riggins about the effects of antipsychotic medication. "Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence . . . ." Id. at 185 (citing Riggins, 504 U.S. at 142-45 (Kennedy, J., concurring)). The Court remanded Sell to the trial court for consideration of these factors.

---

[5] Sell does not expressly address the evidentiary standard needed to establish the four factors. Because the Court said the factors would be satisfied rarely, we agree with United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004), that the Sell "findings must be supported by clear and convincing evidence."

16

## III

We have not previously addressed whether a defendant charged with a crime, who is not competent to stand trial but who is competent to make medical decisions and has refused to take antipsychotic medication, can be involuntarily medicated to restore competency to stand trial.

The issue was addressed only briefly in a Law Division opinion. State v. Otero, 238 N.J. Super. 649 (Law Div. 1989). And, while we are mindful other states have enacted legislation to guide trial courts in these situations,[6] New Jersey has not. Nevertheless, because we are satisfied the State's application to compel medication here fails under the Sell test, we need not determine whether our State Constitution provides greater individual protection than does the Federal Constitution described in Sell. Instead, we reject the State's arguments because we agree with the trial judge's determination that Sell's first factor is not informed by defendant's maximum exposure but by defendant's probable sentence if convicted. A trial court, in applying the Sell test, should also

---

[6] Cal. Penal Code § 1370 (California); Colo. Rev. Stat. § 16-8.5-112 (Colorado); Conn. Gen. Stat § 54-56d (Connecticut); 405 Ill. Comp. Stat. Ann. 5/2-107.1 (Illinois); Me. Rev. Stat. Ann. tit. 15 § 106(3)-(4) (Maine); Md. Code Ann. Health-Gen. § 10-708(b) (Maryland); Ohio Rev. Code. Ann. § 2945.38(B)(1)(C) (Ohio); Or. Rev. Stat. Ann. 2945.38 (Oregon); VT. Stat. Ann. tit. 18 § 7629 (Vermont); Wash. Rev. Code Ann. § 10.77.092 (Washington); Wis. Stat. Ann. § 971.17(3)(c) (Wisconsin); Wyo. Stat. Ann. § 7-11-303(e) (Wyoming).

A-3090-18T3

consider the effects of the medication on a defendant's right to a fair trial. Medical experts should testify about how the medication is likely to affect a defendant's ability to communicate with counsel, to testify, to react rapidly to events in the trial, and to express emotions before the jury. See Sell, 539 U.S. at 185; see also Riggins, 504 U.S. at 137. The effect on physical appearance also should be considered. See Riggins, 504 U.S. at 137. It then is for the trial court to determine if a defendant's right to a fair trial will be adversely affected.

Under Sell, the State has an important interest in "bringing to trial an individual accused of a serious crime" but "special circumstances" might lessen the importance of the State's interest. 539 U.S. at 180. In arguing that there were no special circumstances that lessened the importance of the State's interest, the State urges us to consider that the maximum sentence for this third-degree crime is five years, and that because this was a crime of domestic violence, the presumption of non-incarceration did not apply.

The federal circuit courts have differed on how to apply the first factor under Sell: some rely on the maximum sentence for the charges to evaluate if the crime is serious; others consider the defendant's probable sentence.[7]

---

[7]  See, e.g., United States v. Gutierrez, 704 F.3d 442, 451 (5th Cir. 2013) (following the approach for determining seriousness of a crime utilized by the

We agree with the trial judge that <u>Sell</u>'s first factor requires more than simple consideration of the maximum sentence. The Supreme Court made clear that a case-by-case approach is required. <u>Sell</u>, 539 U.S. at 180. If a trial court only needed to consider the maximum length of the sentence, the Court would not have mentioned the need to consider special circumstances—such as the length of confinement, the potential for future confinement and jail credits to be

---

second, fourth, and tenth circuits, comparing the time the defendant has served pre-trial to the statutory maximum); <u>United States v. White</u>, 620 F.3d 401, 410-11 (4th Cir. 2010) (explaining that notwithstanding the seriousness of a crime, special circumstances such as the time defendant has already been confined compared to his expected sentence, can reduce the State's interest in prosecuting a defendant); <u>United States v. Nicklas</u>, 623 F.3d 1175, 1178-80 (8th Cir. 2010) (considering whether the defendant had served close to or more than his probable sentence, to determine whether special circumstances militated against the government's interest in prosecuting the defendant); <u>United States v. Ruiz-Gaxiola</u>, 623 F.3d 684, 693-94 (9th Cir. 2010) (using the sentencing guideline range for an offense, rather than the statutory maximum, as the starting point for determining the seriousness of a crime); <u>United States v. Green</u>, 532 F.3d 538, 549 (6th Cir. 2008) (utilizing the maximum statutory penalty for a crime as an objective means to assess seriousness); <u>Gomes</u>, 387 F.3d at 160-61 (finding that certain circumstances, such as the potential for a lengthy period of civil commitment which would diminish the risk of future crime, "may lessen the importance" of the State's interest in prosecuting a defendant); <u>United States v. Weinberg</u>, 743 F. Supp. 2d 234, 237 (W.D.N.Y. 2010) (providing that to determine whether there is an important government interest, courts should first consider the nature of the charge and the potential penalty, including the statutory maximum and the sentencing guidelines range for the offense, and then compare that to any period of pretrial incarceration).

applied toward sentencing—all of which could reduce the State's interest in prosecution.

We agree with the trial court that special circumstances lessened the State's interest in this case. We have no reason to disagree with the trial court's analysis that defendant might receive a probationary sentence if treated as a third-degree offender, that his charges appeared to stem from his delusions and he has remained at TPH longer than if convicted. The trial court correctly considered the length of time defendant was confined, his possible need for future confinement and potential jail credits.

We have every confidence that our criminal trial judges can evaluate a defendant's probable sentence based on the charges, the understanding of our sentencing guidelines and the application of probable aggravating and mitigating factors. This approach also is consistent with the Court's understanding that the need to medicate involuntarily to restore a defendant to competency will be rare, which is our expectation as well.

Because we agree with the trial court that the State failed to satisfy the first factor under <u>Sell</u>, we affirm the trial court's order that denied the State's motion to require involuntary medication. We have no occasion to address

A-3090-18T3

whether our State's Constitution would afford defendant greater liberty or privacy.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3090-18T3